Filed 3/27/15  In re Grace G. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re GRACE G., a Person Coming Under the Juvenile Court Law. | B257227 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK72230) |
| Plaintiff and Respondent, | |
| v. | |
| ROCHELLE G., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Robert S. Draper, Judge.  Affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

_____

Rochelle G. (mother) appeals from a juvenile court order denying her petition for a change of court order under Welfare and Institutions Code section 388.[1] Infant Grace G. was removed from mother's custody at birth. Grace was diagnosed as having Down syndrome. Mother was incarcerated at the time Grace was born. She had a long-standing substance abuse problem and had used drugs during her first trimester of pregnancy with Grace. She also had lost or relinquished custody of nine other children and failed to reunify with those who were subject to formal dependency proceedings. The court denied mother reunification services. Grace was placed with a family friend who wished to adopt her. In advance of a hearing to select a permanent plan under section 366.26, mother petitioned the court to grant her reunification services and allow the Los Angeles Department of Children and Family Services (DCFS) discretion to liberalize visits. Mother was participating in a drug treatment program, was complying with a treatment program for mental illness, and had regular monitored visits with Grace. She informed the court she had been drug-free for nearly two years. The juvenile court denied the petition. We affirm the juvenile court order.

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2013, mother gave birth to Grace. Mother was incarcerated at the time. Grace was born with several critical medical problems. Soon after birth, she was diagnosed with Down syndrome.

Grace is mother's tenth child. The juvenile court terminated mother's parental rights as to one of her children before Grace was born. Two of mother's children were permanently placed with their father; the other six were in the custody of legal guardians. Mother had not regained custody of any of her children.[2] Before Grace, the most recent

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Grace's half-siblings are: Z.J., born in 1989 and J.B., born in 1990 (family reunification services terminated for mother and mother's sister awarded legal guardianship); twins Dav. R. and Daj. R., born in 1998 (family reunification services terminated for mother and children placed in home of father); Angel S., born in 2000 (mother's parental rights terminated and child adopted); twins J.A.G. and J.I.G., born in

dependency matter began in April 2012, and concerned J.O.G., who was not yet two years old. A referral was generated alleging general neglect of J.O.G., due to the condition of mother's home, her use of drugs, and her prostitution. Mother had left J.O.G. with a family friend without provision for his support or a plan of care. The referral was substantiated. Two additional referrals followed. DCFS opened a "voluntary case." During the case mother tested positive for amphetamines, methamphetamines, and cannibinoids. In May 2012, mother voluntarily placed J.O.G. with the family friend, who secured a probate legal guardianship in September 2012.

Mother admitted a history of illegal drug use, and that she had tested positive for drugs in the first trimester of her pregnancy with Grace, in July 2012. She told DCFS she had been free of drugs for over three years, then she relapsed. Mother also acknowledged she suffered from mental illness. She had stopped using psychotropic medications during her pregnancy. In October 2012, she was incarcerated. A case social worker on one of mother's previous dependency matters reported mother was "consistently . . . unstable and unable to provide for the needs of her children. She has a history of complying up until the point of being able to reunify with her children and then not following through due to homelessness, relapse, substance abuse, mental health issues or problems with her program or housing."

In May 2013, the juvenile court asserted dependency jurisdiction over Grace under section 300, subdivision (b) and removed her from mother's custody. The court sustained allegations that mother had a history of drug use and was a current user of methamphetamine, cocaine, and marijuana, which rendered her incapable of caring for Grace and had caused three of mother's older children to receive permanent placement services. There were additional sustained allegations that Grace had multiple genetic problems including "multiple organ system malfunction," and mother's substance abuse and incarceration prevented her from providing appropriate care and supervision of

2002, and J.K., born in 2004 (family reunification services terminated and legal guardianship awarded to mother's sister) ; and J.O.G., born 2010 (mother voluntarily placed child with a non-related extended family member for a probate guardianship).

3

Grace, a medically fragile child. The court denied mother reunification services under section 361.5, subdivision (b)(10).

Grace was placed with a family friend. By October 2013, the caregiver and her adult daughter wished to co-adopt Grace. DCFS reported the caregiver had "provided attentive and consistent care for Grace since her release from the hospital after birth. Grace appears bonded to her caregiver, makes eye contact when the caregiver speaks and is comforted by her presence. The caregiver ensures that Grace attends all medical appointments and receives appropriate medical care." DCFS reported there was a referral involving the caregiver from 1998, involving her two daughters; the allegations were determined to be unfounded and unsubstantiated. However, the caregiver revealed that her daughter was detained in 1983 for sexual abuse. In December 2013, a referral was opened when Grace suffered a bruise under her eye; the caregiver said she had fallen asleep while holding Grace and Grace tumbled to the floor. These issues delayed the completion of an adoption home study.

In the meantime, mother was released from custody and she began a 13-month residential drug treatment program. Mother had regular monitored visits with Grace every other week. The caregiver reported the visits went well and mother was "appropriate" with Grace. In October 2013, mother filed a section 388 petition to change the court order denying her reunification services. Mother asserted she was enrolled in an inpatient substance abuse program, was "testing clean," taking medication for her bipolar condition, and she was taking a parenting class. She argued she had made progress in addressing the issues that precipitated the juvenile court's involvement and she had maintained a relationship with Grace. The court denied the petition without prejudice. The court suggested mother could file a new petition after completing a drug treatment program.

In February 2014, mother filed another section 388 petition. Mother again reported that she was in an inpatient substance abuse program. She had remained sober, was receiving individual therapy and attending 12-step meetings, and continued taking

4

psychotropic medication. She was consistently visiting Grace and she asserted visits were "appropriate and nurturing." The court ordered a hearing on the petition.

In April 2014, the substance abuse program issued several letters regarding mother's progress. Mother was scheduled to complete the program in August 2014. One letter reported mother had completed over 200 days in the "Fresh Start Program," and was randomly tested for drugs. It further indicated mother was "in 'good standing' taking responsibility in her role as Mother and caregiver as observed in positive and caring interactions with Children visiting." Another stated: "[Mother] is in need of full wrap-around services for her minor children as she is searching out Permanent housing while preparing for transfer of children into her care, it is important that she be considered for extra services while in the planning stages." An additional letter reported: "[Mother] began her visits with . . . Grace on August 22, 2013, immediately after completing (initial 30 day restricted period)[.] The overall care and bonding with Gracie is witnessed preparing appropriate food and snacks, healthy interactions with Mother, brothers and sisters during weekend and overnight visits during this time period up to present. [¶] Our goal with [mother] is to support and provide a great opportunity for establishing a strong Mother/Child bond that will prove positive for the continued care and growth of the minor Child."

DCFS opposed a change of the juvenile court's order. The agency argued mother had completed substance abuse programs before and had relapsed, causing her other children to be permanently removed from her custody. DCFS asserted Grace would need "even more attentive care given her special needs. Although the Department applauds mother's efforts to address her mental health and substance abuse issues, a recommendation for family reunification services cannot be made at this time."

At the June 2014 hearing on the petition, mother testified that she was taking medications to manage her bipolar disorder and PTSD. Her last "dirty test" was in July 2012. She was on step seven of a 12-step drug rehabilitation program. Mother testified that although she had completed two substance abuse programs in the past, she had changed. Mother reported: "[B]eing incarcerated and having an opportunity to sit down

5

for eight months, I realized that my substance abuse and not able to provide safety for my kids and neglect has become a problem, and I knew that I had to do something different this time around. . . . And this is the longest program inpatient that I ever did." She testified she was visiting with her other children as well as Grace. She expected to have permanent housing by the next month.

The juvenile court denied mother's 388 petition. The court concluded: "Basically, the point is that the mother's best interests are no longer at the center of what we're talking about. It's the child's best interest. [¶] Based on the record before me, I do not believe the child's best interest would be served by granting the motion, so I'm denying the motion . . . ." Mother's appeal followed.

## DISCUSSION

### I. The Juvenile Court Did Not Abuse its Discretion in Denying Mother's 388 Petition

"A juvenile court dependency order may be changed, modified, or set aside at any time. (§ 385.) A parent may petition the court for such a modification on grounds of change of circumstance or new evidence. (§ 388, subd. (a).) The parent, however, must also show that the proposed change would promote the best interests of the child. (§ 388, subd. (a)(2); [Citation].) [¶] Whether the juvenile court should modify a previously made order rests within its discretion, and its determination may not be disturbed unless there has been a clear abuse of discretion. [Citation.] '. . . .'' ['']The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' '' ' [Citation.]" (*In re J.C.* (2014) 226 Cal.App.4th 503, 525-526 (*J.C.*).)

Mother contends the juvenile court abused its discretion in concluding awarding her reunification services and allowing for liberalized visitation would not be in Grace's best interest. We disagree. Although mother had laudably taken steps to address the substance abuse problems and mental illness that had previously rendered her unable to care for Grace and her siblings, the court was correct that its focus was properly on

6

ensuring permanence and stability for Grace. The section 366.26 hearing was imminent. Although mother's circumstances may have changed, the trial court could reasonably conclude it would not be in Grace's best interest to delay permanency while allowing mother time to reunify with her.

It is well established that "[a]fter the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) "[S]uch presumption obviously applies with even greater strength when the permanent plan is adoption rather than foster care. A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, what is in the best interest of the child." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.)

The juvenile court could reasonably conclude mother did not establish that granting her reunification services, and thereby delaying a permanent plan for Grace, would be in Grace's best interest. Grace was a very young child with special needs who had lived with her caregiver since birth. She was bonded to the caregiver. Mother, on the other hand, had already completed two substance abuse programs in the past, had relapsed into drug use, and had lost or relinquished custody of nine other children. There was evidence that mother had regular monitored visits with Grace, but little or no evidence that mother's relationship with Grace was significant *for Grace*. Mother had been unable to attend Grace's Regional Center appointments. She was also waiting to be able to take a parenting class for special needs children.

On appeal, mother notes the juvenile court relied on *J.C.*, and contends the case at bar was different. Mother asserts that, unlike in *J.C.*, there was no evidence Grace "would be devastated and suffer great detriment" if mother were granted reunification services. We disagree that *J.C.* created such a standard to be applied in every case. Instead, the court in *J.C.* concluded that, as set forth in prior California cases, juvenile

7

courts hearing motions for a change of court order after reunification efforts have been terminated must recognize a shift of focus in the proceedings to the best interests of the child. (*J.C., supra,* at p. 527.)

In *J.C.*, as in this case, the child was removed from the mother's custody at birth and the child's older siblings were dependent children of the juvenile court with whom mother had not yet reunified. (*J.C., supra,* at pp. 507-508.) The mother struggled with drug addiction. The child was placed with a maternal aunt who wished to adopt her. The mother was granted reunification services but those services were terminated. She eventually filed a section 388 petition seeking to have the child returned to her custody. The appellate court affirmed the juvenile court ruling denying the petition. The court explained that while the mother's "long-term sobriety and renewed interest in parenting classes showed changed circumstances . . . . Mother did not establish that an order giving her custody of J.C. would be in the child's best interests." (*Id.* at p. 526.)

Although the mother had worked to develop a parent-child relationship with J.C., the evidence indicated the maternal aunt had provided the child with "the only loving, safe, and stable home she has ever known," and removing her from that home would not further her interest in permanence and stability. (*J.C., supra,* at pp. 527-528.) The evidence established the child's "best interests are not to further delay permanency and stability in favor of rewarding Mother for her hard work and efforts to reunify." (*Id.* at p. 527.) Similarly, in this case, there was evidence it was not in Grace's best interest to delay permanence and stability in favor of awarding mother reunification services.

Mother further contends the court should have applied the factors set forth in *In re Kimberly F.* (1997) 56 Cal.App.4th 519 (*Kimberly F.*), despite the *J.C.* court's rejection of the *Kimberly F.* analysis as inconsistent with prior California Supreme Court precedent. We disagree that the trial court erred in applying the reasoning of *J.C.*, which was in many respects similar to the case at bar. Further, even if the court should have considered the *Kimberly F.* analysis, it is clear that any error would be harmless because the *Kimberly F.* factors did not weigh in mother's favor. The *Kimberly F.* court reasoned that in determining whether a change in a court order would be in the best interest of the

child, the juvenile court should consider: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Kimberly F.*, *supra,* 56 Cal.App.4th at p. 532.) The court indicated these considerations were a non-exhaustive list.

Here, the problems which led to the dependency were very serious—mother's substance abuse problem which was longstanding, and her inability to care for Grace. These were recurring problems for mother, who lost or relinquished custody of all nine of her older children for reasons that appeared to involve substance abuse, mental illness, and a general inability to provide adequate care. And, while mother had been free from drugs for a lengthy period at the section 388 hearing, she admitted to DCFS that she had previously been sober for three years before her most recent relapse. In addition, mother was incarcerated during some of the period, and had been in a residential treatment program for another significant portion. She had yet to demonstrate sobriety while not in the controlled setting of prison or a residential program. The juvenile court could properly consider that mother had previously completed two substance abuse programs, yet was unable to stay permanently free from substance abuse. (*In re Clifton B.* (2000) 81 Cal.App.4th 415, 423-424.)

As to a bond between mother and Grace, there was only evidence that mother had positive and appropriate visits with Grace, who had been removed from mother's custody at birth. In contrast, there was evidence Grace had developed a bond with her caregiver. Finally, the problems causing the dependency were not easily removed or ameliorated. Mother had a long history of substance abuse, mental illness, and a resulting inability to adequately care for her children. (See *In re Mary G.* (2007) 151 Cal.App.4th 184, 206 [in determination of changed circumstances comparing 23-year-history of drug abuse with relatively short period of sobriety].) It is not reasonably likely that the application of the *Kimberly F.* factors would have yielded a different result on mother's section 388 petition.

9

In addition, any uncertainty in the prospect of Grace being adopted by her caregiver did not necessarily change the analysis. The juvenile court could reasonably conclude that even if the plan for adoption by the caregiver fell through, it would not be in Grace's best interest to delay attempts at finalizing an appropriate permanent plan in order to award mother time to reunify.[3] We find no abuse of discretion.

## DISPOSITION

The juvenile court order is affirmed.

BIGELOW, P.J.

We concur:

RUBIN, J.

GRIMES, J.

---

[3] The juvenile court also noted: "[W]hen we come to the .26 hearing, if additional facts come out, then I will obviously reconsider that in the sense of advising [mother] that another 388 might be an appropriate vehicle."